Richard Adam **SHERROAN**, Appellant,

v.

**COMMONWEALTH OF KENTUCKY,**
**Appellee.**

No. 2002–SC–0126–MR.

Supreme Court of Kentucky.

Aug. 26, 2004.

---

7. *Knapp v. Stanford,* 392 So.2d 196, 198 (Miss.1980).

8. *Id.* at 199.

Randall L. Wheeler, Assistant Public Advocate, Frankfort, Counsel for Appellant.

Gregory D. Stumbo, Attorney General, Ian G. Sonego, Assistant Attorney General, Office of Attorney General, Criminal Appellate Division, Frankfort, Counsel for Appellee.

COOPER, Justice.

On April 20, 1999, Frank Reschke, stepfather of Appellant, Richard Adam Sherroan, and two of Appellant's acquaintances, Aaron Mills and Isaac Davis, were all fatally shot with the same .38 caliber revolver. Appellant was indicted for all three homicides. He claimed Mills and Davis killed Reschke and that he killed Mills and Davis in retaliation. His only defense was

that he killed Mills and Davis while acting under the influence of extreme emotional disturbance ("EED").

A Fayette Circuit Court jury convicted Appellant of the intentional murders of Mills and Davis, KRS 507.020(1)(a), but acquitted him of the charge that he killed Reschke. He was sentenced to two concurrent terms of life in prison without the possibility of parole, KRS 532.030(1), and appeals to this Court as a matter of right, Ky. Const. § 110(2)(b), asserting that the trial court erred by: (1) prohibiting defense counsel from asking potential jurors during voir dire whether they could consider the full range of penalties for lesser-included offenses and whether they would consider a defendant's troubled background as a mitigating circumstance; (2) overruling his motion to strike two potential jurors for cause; (3) refusing to declare a mistrial when two witnesses testified that Appellant was on probation when the killings occurred; (4) admitting evidence that Appellant threatened to kill an unrelated third party; (5) excluding his mother's testimony regarding his pattern of behavior in reaction to the deaths of loved ones and acquaintances; (6) refusing to instruct the jury that EED is an element of the offense of manslaughter in the first degree; (7) refusing to instruct the jury that if it had a reasonable doubt as to whether Appellant was acting under EED, it should not find him guilty of manslaughter in the first degree; and (8) permitting the Commonwealth to submit more than one victim impact statement at the sentencing hearing in violation of KRS 421.500. Finding no error, we affirm.

\* \* \*

On April 19, 1999, Marcil Doan–Chadwick, Appellant's former girlfriend and the mother of his two children, advised Appellant that someone had reported to the social services office that they were abusing and neglecting their children. A social worker was scheduled to visit Doan–Chadwick's apartment the following morning and Doan–Chadwick requested that Appellant come to the meeting. Later that day, Appellant proceeded to the Bellmeade Court residence of his mother and stepfather, Lisa and Frank Reschke, where he stored his belongings and occasionally stayed. That night, Lisa informed Appellant that she and Frank wanted him to move out of the residence. According to Lisa, Appellant did not seem upset at this request. He slept there that night and intended to move out the next day.

That same night, Aaron Mills hosted a party at his apartment on Redding Road. Isaac Davis and six other persons attended. Appellant was not present. Polaroid photographs taken at the party show the attendees using cocaine and consuming alcoholic beverages. Other photographs also show Mills and Davis, among others, posing while brandishing the .38 caliber revolver that later became the murder weapon. The party continued until approximately 5:00 a.m.

At about 8:30 a.m. on April 20th, Appellant went to Doan–Chadwick's apartment to meet with the social worker. After the meeting, Doan–Chadwick told Appellant that she planned to move with her boyfriend to another part of the state. Appellant became upset and begged her not to leave. He then proceeded to Bridgett Kincaid's apartment to pick up some clothes that she had washed for him. Kincaid was Aaron Mills's sister and babysat Appellant's children. She described Appellant as very upset and angry about the meeting with the social worker, and about the fact that her husband had borrowed a pair of Appellant's blue jeans. She testified that Appellant threatened to kill the

social worker if she took his children from him.

The three homicides occurred approximately two hours later. In an audiotaped statement to the police, Appellant described his version of how the shootings transpired. At around noon, Appellant, with Davis and Mills, went to the Reschke residence to remove his belongings as planned. Frank Reschke became agitated because Davis and Mills had accompanied Appellant to his residence. While Appellant was downstairs gathering his belongings, Davis and Mills remained upstairs with Reschke. When Appellant came upstairs, Reschke told him to "hurry up and get out of here," then rose from his seat and started towards him. Davis and Mills immediately opened fire on Reschke, fatally shooting him several times while Appellant watched.[1] Appellant, Davis, and Mills then proceeded to Mills's apartment. Upon their arrival, Davis went to sleep on the sofa, and Mills rested on his bed as if "[Reschke's murder] was no big ... deal." Appellant reloaded the gun and fatally shot Mills. He then roused Davis and fatally shot him as well. Appellant left the apartment, taking the murder weapon and a cardboard box containing drugs, drug paraphernalia, and a small amount of money. After returning to the Reschke residence and obtaining his stepfather's automobile, he proceeded to the home of Lester Baker, an acquaintance who had previously helped him with his substance abuse problems. Baker turned him away because he was carrying drugs. Appellant then traveled to Louisville where police apprehended him the following day. He told the police that he felt no remorse and that he was justified in killing Mills and Davis because they had killed Reschke.

## I. JURY SELECTION ISSUES.

### A. Voir dire: Range of penalties.

■ The trial judge precluded Appellant from asking potential jurors whether they could consider imposing the minimum sentence for a lesser included offense of the murder charge. He asserts that (1) our opinion in *Lawson v. Commonwealth*, Ky., 53 S.W.3d 534 (2001), which limits penalty-range voir dire to indicted offenses, does not apply to capital cases, and (2) that a capital defendant has a constitutional right to a jury that could consider imposing the minimum sentence for a lesser included offense. He is mistaken in both respects.

In support of his claim that *Lawson* authorizes penalty-range voir dire with respect to lesser included offenses in a capital case, Appellant cites that opinion's repeated references to non-capital cases. *See, e.g., id.* at 544 ("that in all *non-capital* criminal cases where a party or the trial court wishes to voir dire the jury panel regarding its ability to consider the full range of penalties for each indicted offense, the questioner should define the penalty range in terms of possible minimum and maximum sentences for each class of offense.") (emphasis added); *id.* (setting forth "twenty (20) years to life imprisonment for a Class A felony or a capital offense *for which the death penalty is not authorized,*" as the appropriate range of penalties for a Class A non-death penalty offense) (emphasis added). This reliance is misplaced. *Lawson* was not a capital case, and the quoted language does not hold that penalty-range voir dire is limited to indicted offenses only in non-capital cases. In *Lawson*, the Common-

---

1. Appellant did not explain how both Davis and Mills managed to shoot Reschke with the same .38 caliber revolver.

wealth unsuccessfully urged this Court to permit penalty-range voir dire only in capital cases, and to eliminate its use altogether in non-capital cases. *Id.* at 541. Of course, proper penalty-range voir dire for capital cases had already been established in *Morris v. Commonwealth*, Ky., 766 S.W.2d 58, 60 (1989), which did not authorize inquiry into the penalty ranges for possible lesser included offenses. *Lawson* merely extended this principle to non-capital cases where the scope of penalty-range voir dire had been previously unsettled. *Lawson*, at 544.

 Appellant's argument that capital defendants are constitutionally guaranteed the right to voir dire the jury regarding lesser included offenses in death penalty cases is also meritless. He contends that because Due Process rights become more critical in a capital trial, *Gardner v. Florida*, 430 U.S. 349, 357–58, 97 S.Ct. 1197, 1204–05, 51 L.Ed.2d 393 (1977), and because the United States Constitution requires the sentencer to give full consideration to lesser included non-capital offenses, *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), the availability of penalty-range voir dire on lesser included offenses is elevated to the status of a constitutional right.

No authority holds that the Constitution requires voir dire to include inquiry into penalty ranges for lesser included offenses. In fact, as noted in *Caudill v. Commonwealth*, Ky., 120 S.W.3d 635 (2003), no court except ours has ever held that a juror is disqualified simply because he or she cannot consider the minimum authorized sentence *for the indicted offense. Id.* at 654. In *Morgan v. Illinois*, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), the Court held that a juror who would automatically vote for the death penalty was disqualified, *id.* at 729, 112

S.Ct. at 2229–30, but also noted that "[t]he Constitution, after all, does not dictate a catechism for voir dire, but only that the defendant be afforded an impartial jury." *Id.* at 729, 112 S.Ct. at 2230. *See generally Rosales–Lopez v. United States*, 451 U.S. 182, 189, 101 S.Ct. 1629, 1634, 68 L.Ed.2d 22 (1981) (trial courts have broad discretion in conducting voir dire). Nor does *Beck* require that defendants be allowed to voir dire the jury on penalties for lesser offenses; *Beck* only requires that capital juries be *instructed* on lesser included offenses upon request. *Id.* at 638–43, 100 S.Ct. at 2390–92. Because Appellant was permitted to ask jurors whether they could consider penalties within the range set forth in *Morris* and was able to ensure that they would not automatically impose the death penalty per *Morgan*, he was provided the full protection of his constitutional right to an impartial jury.

*B. Voir dire: Mitigating circumstances.*

 During individual voir dire, the trial judge inquired of the prospective jurors whether they could consider mitigating circumstances, such as alcohol and mental state, in fixing a penalty in this case. Appellant, however, asserts that the trial court should have permitted him to ask prospective jurors how they would weigh particular mitigating circumstances. For example, the Commonwealth's objections to each of the following lines of questioning were sustained: "If you are in the process of kind of selecting between one of those punishments, would the fact that someone was under the influence ...;" and "In picking a penalty, if you heard something about someone's background and how they grew up, would that be something ...."

 Appellant contends that KRS 532.025(2)(b) and the United States and Kentucky Constitutions afford him the

right to conduct individual voir dire on specific mitigating circumstances. He is wrong. KRS 532.025(2)(b) is totally unrelated to voir dire. That statute only requires that the jury be instructed to consider mitigating circumstances supported by the evidence. Under federal law, this issue became moot when the death penalty was not imposed. *Harmelin v. Michigan*, 501 U.S. 957, 996, 111 S.Ct. 2680, 2702, 115 L.Ed.2d 836 (1991) (referring to life without parole, "We have drawn the line of required individualized sentencing at capital cases, and see no basis for extending it further."). Nevertheless, the constitutional bar against capital sentences imposed without an individualized determination that the punishment is appropriate, *id.* at 995, 111 S.Ct. at 2701, does not entitle the defendant to jurors who are bound to *weigh* mitigating evidence in his favor. *Graham v. Collins*, 506 U.S. 461, 475, 113 S.Ct. 892, 902, 122 L.Ed.2d 260 (1993). *See also Johnson v. Texas*, 509 U.S. 350, 372, 113 S.Ct. 2658, 2671, 125 L.Ed.2d 290 (1993) (rejecting petitioner's argument because "[i]nstead of requiring that a jury be able to consider in some manner all of a defendant's relevant mitigating evidence, the rule would require that a jury be able to give effect to mitigating evidence in every conceivable manner in which the evidence might be relevant."). *See also Soria v. Johnson*, 207 F.3d 232, 243–44 (5th Cir.2000) (not error to preclude defendant from asking juror whether he would view certain evidence *as mitigating* rather than simply consider it); *Sellers v. Ward*, 135 F.3d 1333, 1341–42 (10th Cir.1998) (Constitution only guarantees jury that will not automatically impose death penalty and real inquiry is whether juror would refuse to consider mitigating evidence of any kind).

All of the cases upon which Appellant relies involved scenarios where the sentencer was precluded from *considering* the mitigating evidence presented by the defendant. *See, e.g., Penry v. Lynaugh*, 492 U.S. 302, 319–28, 109 S.Ct. 2934, 2947–52, 106 L.Ed.2d 256 (1989) (invalidating sentencing procedure that permitted jury to consider only three special issues in deciding whether to impose death penalty, none of which left room for consideration of defendant's mental retardation as a mitigating circumstance), *overruled on other grounds by Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002); *Eddings v. Oklahoma*, 455 U.S. 104, 113–15, 102 S.Ct. 869, 876–77, 71 L.Ed.2d 1 (1982) (invalidating death sentence where sentencing judge concluded as a matter of law that he was precluded from considering mitigating evidence); *Lockett v. Ohio*, 438 U.S. 586, 608, 98 S.Ct. 2954, 2967, 57 L.Ed.2d 973 (1978) (plurality) (invalidating statute that limited judge's consideration of mitigating circumstances); *Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976) (plurality) (invalidating mandatory death penalty statute); *Wright v. Walls*, 288 F.3d 937, 943 n. 4 (7th Cir. 2002) (while not required to give weight to mitigating evidence, sentencer must consider it).

Further, asking potential jurors how they would weigh specific mitigating circumstances would ignore well-settled precedent that it is impermissible to ask voir dire questions designed to commit jurors to certain theories. *Furnish v. Commonwealth*, Ky., 95 S.W.3d 34, 44 (2002); *Woodall v. Commonwealth*, Ky., 63 S.W.3d 104, 116 (2001).

 The Constitution permits trial judges great leeway in addressing a defendant's request for more in-depth questioning of prospective jurors:

The Constitution does not always entitle a defendant to have questions

posed during Voir dire specifically directed to matters that conceivably might prejudice veniremen against him. Voir dire "is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion." This is so because the "determination of impartiality, in which demeanor plays such an important part, is particularly within the province of the trial judge." Thus, the State's obligation to the defendant to impanel an impartial jury generally can be satisfied by less than an inquiry into a specific prejudice feared by the defendant.

*Ristaino v. Ross,* 424 U.S. 589, 594–95, 96 S.Ct. 1017, 1020–21, 47 L.Ed.2d 258 (1976) (internal citations omitted). We note in passing that Appellant *was* permitted to ask the jury during group voir dire how they thought a person's upbringing and background might affect that person's propensity for crime. Additionally, the trial judge's inquiry into mitigating circumstances was more than sufficient. On at least two occasions, he questioned prospective jurors on personal background as a mitigator. He also asked prospective jurors whether they would consider mitigating evidence *as mitigating* if so instructed. The voir dire examination of jurors on the issue of mitigating circumstances was more than adequate.

*C. Denial of strikes for cause.*

■ Appellant asserts that the trial court abused its discretion in refusing to strike Jurors 380 and 500 for cause. We disagree. During individual voir dire, Juror 380 was questioned extensively about his ability to consider the full range of penalties for murder.[2] First, the court asked him if he could consider all five

penalties in a case involving multiple murders. He responded that he could, stating, "Yeah ... I guess it depends on how it went, on the evidence." He also stated that he would not automatically exclude or include any penalty. When asked what penalties he would consider in the case of intentional murder, the juror asked, "Just plain out intentional murder, no other circumstances?" He then responded that he would consider the three harshest penalties "unless someone could prove to me otherwise." However, when asked whether he would consider all of the penalties if so instructed or if he would always limit himself to the three severest penalties in the case of intentional murder, he replied that he would *not* always opt for the three harshest penalties and that it would "depend on the evidence."

When asked whether he could consider all five penalties in a murder case, Juror 500 responded in the affirmative and indicated that he would not automatically exclude or include any of the listed punishments. His dialogue with defense counsel is illuminating:

Q: If in addition to this intentional murder, not an accident, not self defense ... If you found that and an aggravating circumstance ... when you found that an intentional murder occurred and an aggravating circumstance existed, under those circumstances do you think you could fully consider that whole range of penalties?

 . . .

A: I believe I would want to ... consider them all still, even still.

2. A poster illustrating the possible penalties was used. The penalties were listed as follows in descending order: a term of twenty to fifty years imprisonment, life imprisonment,

life imprisonment without the possibility of parole for twenty-five years, life imprisonment without the possibility of parole, and the death penalty.

Q: Could you fairly consider twenty years in a case of aggravated intentional murder?

A: I would consider it. That's not a final decision, but it's a consideration.

Q: I might say the same thing .... I might consider doing a lot of things that I have no intention of doing ....

Q: Do you mean you would fairly and truly consider it?

A: That's what I would want to do.

. . .

Q: Do you think you would be able to do it?

A: I would certainly want to do that, yes. I think so. I could.

. . .

Q: Listening to your answers, I get the feeling that if you're on a jury, that you favor these bottom couple of penalties ... in that intentional murder with an aggravator type of case ....

A: I would probably, just, from what you're telling me, is in the middle there, kinda' being cornered, that's my first thought, I guess.

■■■■ Whether to strike a prospective juror for cause lies within the sound discretion of the trial judge, *Barth v. Commonwealth*, Ky., 80 S.W.3d 390, 398 (2001) (citations omitted), and that decision will not be disturbed absent a clear abuse of discretion. *Id.* at 398–99. A strike for cause is necessary only when there are reasonable grounds "to believe that a prospective juror cannot render a fair and impartial verdict." RCr 9.36(1). Such grounds do not exist simply because a juror may favor harsher penalties. *Mabe*

*v. Commonwealth*, Ky., 884 S.W.2d 668, 671 (1994) ("A per se disqualification is not required merely because a juror does not instantly embrace every legal concept presented during voir dire examination."); *Woodall v. Commonwealth, supra,* at 119.

No abuse of discretion occurred here. Both jurors stated that they would consider the full range of penalties. They expressed minor misgivings about their ability to consider the full range of penalties only when presented with a worst-case scenario, an aggravated intentional murder with no mitigating circumstances. Such did not require that they be excused for cause. *Mabe, supra,* at 671 ("The test is not whether a juror agrees with the law when it is presented in the most extreme manner."). Their responses indicated that they would weigh all the evidence, including mitigating circumstances, before arriving at a verdict. Nor were they biased in favor of the death penalty. Notably, Juror 380 stated, "It would have to be pretty bad to sentence another man to death."

## II. EVIDENCE ISSUES.

*A. Reference to Appellant's probation status.*

■■■■ The trial court made a pre-trial ruling pursuant to KRE 404(b) and KRE 103(d) to exclude evidence of Appellant's parole violation and a warrant for his arrest on unrelated charges. Nonetheless, two witnesses made unsolicited comments that Appellant was on probation.[3] In each instance, Appellant's motion for a mistrial was denied. He claims that this amounts to reversible error. We disagree.

In describing their encounter following the shootings, Lester Baker testified, "Like I told him, you know, we were both on probation, and theoretically, we weren't

---

3. It was never established that Appellant was, in fact, on probation—only that he was on parole. The witnesses apparently confused parole with probation.

supposed to even be together." Though overruling Appellant's motion for a mistrial, the trial court offered to admonish the jury to disregard that portion of Baker's testimony. Defense counsel rejected the offer, explaining that the admonition would only "highlight and underline" the impermissible testimony. While testifying on direct examination by the Commonwealth concerning the circumstances that prompted the police to search for Appellant as a suspect in the shootings, Lieutenant Mark Barnard of the Lexington Police Department testified, "At that time we knew he had a probation violation." Again, the trial court denied Appellant's motion for a mistrial and offered to admonish the jury to disregard the testimony. Again, Appellant declined the court's offer.

▆▆▆▆ A mistrial is unwarranted absent a "manifest" or "real necessity" for such an extraordinary remedy. *Grundy v. Commonwealth*, Ky., 25 S.W.3d 76, 82 (2000) (internal quotations omitted). This high standard results from the presumption that an admonition "can cure a defect in testimony." *Alexander v. Commonwealth*, Ky., 862 S.W.2d 856, 859 (1993), *overruled on other grounds by Stringer v. Commonwealth*, Ky., 956 S.W.2d 883, 891 (1997). *See also Price v. Commonwealth*, Ky., 59 S.W.3d 878, 881 (2001). The presumption is overcome in only two situations: (1) when an overwhelming probability exists that the jury is incapable of following the admonition *and* a strong likelihood exists that the impermissible evidence would be devastating to the defendant; or (2) when the question was not premised on a factual basis *and* "was 'inflammatory' or 'highly prejudicial.'" *Johnson v. Commonwealth*, Ky., 105 S.W.3d 430, 441 (2003) (citations omitted). This standard is the same where the movant waives the protections of an admonition due to oversight or as a matter of

trial strategy. If an admonition is offered in response to a timely objection but rejected by the aggrieved party as insufficient, the only question on appeal is whether the admonition would have cured the alleged error. *Graves v. Commonwealth*, Ky., 17 S.W.3d 858, 865 (2000) (no error in refusing to grant mistrial because admission of impermissible evidence could have been cured by an admonition, which defendant did not request).

Applying the first exception set forth in *Johnson*, it would be tenuous to conclude that the jury was incapable of ignoring such brief and undetailed remarks regarding Appellant's probation, and even more tenuous to conclude that they were "devastating" to his defense. *See, e.g., Kinser v. Commonwealth*, Ky., 741 S.W.2d 648, 653 (1987) (admonition sufficient to cure police testimony that he "knew enough about the case to think that [the defendants] had possibly committed this murder"). The second exception is inapplicable as well. Both remarks were unsolicited (one was elicited during *Appellant's* cross-examination of the witness), so the requirement that the impermissible testimony originate from a question lacking a factual basis is unmet. Also, because the jury could have assumed that Appellant was on probation for any number of relatively minor crimes, the testimony was not "inflammatory;" both references to Appellant's probation lacked any description of the underlying offense. *Johnson, supra*, at 441, 113 S.Ct. 2658 (admonition sufficient to cure prosecutor's reference to defendant's guilty plea where no reference was made to the underlying offense and the jury could have assumed Appellant pled guilty to a speeding violation). The jury could also have assumed that Appellant was on probation for a drug-related conviction, which would not have prejudiced him, because his own audiotaped statement, which was played to the jury, contained numerous references to

his illegal drug use. There was no manifest necessity warranting a mistrial.

### B. *Threat to kill the social worker.*

Bridgett Kincaid testified that Appellant came to her residence after his meeting with the social worker only a few hours before the homicides occurred, and that he was very angry about the meeting and about the fact that Kincaid's husband had borrowed a pair of Appellant's blue jeans. During their conversation, Appellant stated that if the social worker "took his kids, he would kill her."

It has long been a rule in this jurisdiction that threats against the victim of a crime are probative of the defendant's motive and intent to commit the crime, *Richie v. Commonwealth*, Ky., 242 S.W.2d 1000, 1004 (1951), and general threats against no one in particular are probative to demonstrate general malice and a purpose to injure or kill someone, of which the deceased became the unfortunate victim. *Brooks v. Commonwealth*, 100 Ky. 194, 37 S.W. 1043, 1045 (1896). However, specific threats directed against third parties are inadmissible.

> While a threat to kill or injure someone which is couched in vague terms and directed at no one person in particular is admissible in a homicide prosecution to show a hostility towards mankind in general and hence towards the deceased, a threat to kill or injure someone which is specifically directed at some individual other than the deceased is inadmissible, as it shows only a special malice resulting from a transaction with which the deceased had no connection.

*Jones v. Commonwealth*, Ky., 560 S.W.2d 810, 812 (1977). *See also Burden v. Commonwealth*, 296 Ky. 553, 178 S.W.2d 1, 3 (1944); *Fugate v. Commonwealth*, 202 Ky. 509, 260 S.W. 338, 340–41 (1924). An exception has been recognized when the threat against the third person is so close in time to the charged offense as to be considered a part of the same transaction. *Chatt v. Commonwealth*, 268 Ky. 141, 103 S.W.2d 952, 954–55 (1937) (threat against third party less than a minute before the killing); *Smith v. Commonwealth*, Ky., 92 S.W. 610, 610 (1906) (threat against third party five minutes before the killing).

All of these cases were decided prior to the adoption of the Kentucky Rules of Evidence (KRE). However, they are premised upon the same exclusionary policy reflected by KRE 404(b), that evidence of other crimes, wrongs or acts is inadmissible to prove the character of a person in order to show action in conformity therewith. However, such evidence is admissible if offered for another purpose, *see, e.g., Tamme v. Commonwealth*, Ky., 973 S.W.2d 13, 29–30 (1998) (evidence of subornation of perjury admissible to prove consciousness of guilt), or inextricably intertwined with other evidence essential to the case. Under KRE 404(b)(1), "[T]he admissibility issue for the judge is ... whether the other crimes evidence is admissible for some purpose other than proving propensity of the defendant to commit criminal acts." Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 2.25[5], at 151 (4th ed. LexisNexis 2003). If so, the issue becomes whether the probative value of the evidence is substantially outweighed by the danger of undue prejudice, KRE 403, and the trial judge's ruling in that regard is reviewed for abuse of discretion. *Commonwealth v. English*, Ky., 993 S.W.2d 941, 945 (1999).

The result of both inquiries supports the admission of Appellant's threat against the social worker. Other jurisdictions have admitted evidence of threats against third parties if relevant to prove the defendant's state of mind at the time of the crime. *E.g., State v. DeSantiago*, 429 N.W.2d 566,

567 (Iowa Ct.App.1988) (evidence of threat to kill third person earlier the same evening as the charged offense relevant to rebut defense of lack of intent); *People v. Rushlow*, 179 Mich.App. 172, 445 N.W.2d 222, 224 (1989) (evidence in trial for murder of topless dancer that defendant threatened to kill another topless dancer forty-five minutes before the murder relevant to prove willingness to kill if denied sexual favors and to disprove defenses of self-defense and accident). The facts of this case provide an even stronger justification for admitting evidence of Appellant's conduct within hours of the crime. Here, Appellant was charged with killing all three victims. He denied killing Reschke and claimed that he killed Mills and Davis while under the influence of extreme emotional disturbance triggered by witnessing Mills and Davis kill Reschke. Kincaid's testimony tended to prove that Appellant was so emotionally disturbed before Reschke's death that he threatened to kill yet another person. This evidence of Appellant's state of mind only a few hours before the homicides tended to disprove his claim that Reschke's murder triggered his emotional disturbance, thus bolstering the Commonwealth's theory that Appellant, not Mills and Davis, killed Reschke. Since the evidence was relevant for a purpose other than proving Appellant's criminal disposition, it was admissible unless excluded under KRE 403. In admitting the evidence, the trial court intimated that the evidence also tended to support Appellant's claim that he was, indeed, emotionally disturbed when the killings occurred, thus indicating that the evidence was not so prejudicial to Appellant as to substantially outweigh its probative value. We perceive no abuse of discretion in that conclusion.

### C. Character evidence.

Appellant claims that the trial court erred by excluding evidence of his past adverse reactions to the loss of friends and loved ones. Appellant's mother offered the following testimony by way of avowal.

Q: Lisa, I want to go back to what we were talking about earlier, with uh Ricky's behavior uh contemporaneous with the death of someone he was close to or knew very well. And I think you told us about his brother Davey, and about his grandmother, about the kid with, uh, leukemia who was a football player, uh, the kid with MS at Stone Street.

. . .

A: Yes.

Q: And there was a friend killed in a quarry murder here in Lexington, I think.

A: I believe so.

Q: And some friends that were killed when they were hit on riding an ATV by a train.

A: Yes.

Q: And he has an uncle who died of a heart attack.

A: Yes.

Q: And I think he had a grandfather who died of cancer.

A: Yes.

Q: And after each one of these deaths of someone that he knew, that he experienced . . . was there a change in his behavior?

A: Yes. With all of the deaths with the exception of one, which was my father's death. My father's death was, um, through cancer, long, drawn out, and, uh, was a natural death. And we were expecting it for a long time. But with all of the

other ones, they were unexpected, and he did have a behavior.

Q: And did some of these deaths cause such, I guess, a bad time for Ricky that he was actually referred to counseling to deal with [them].

A: He was admitted to a hospital after one of them and, yes, counseling with another.

Q: Part of the symptoms he would display after experiencing one of these deaths would be acting out?

A: Yes.

Q: Getting angry or upset?

A: Exactly.

Q: And this acting out would take the form of actually physically doing things, right?

A: Yes.

 The trial judge concluded that the evidence was "habit" evidence, which is inadmissible in Kentucky. *Burchett v. Commonwealth*, Ky., 98 S.W.3d 492, 494–99 (2003). However:

> A habit . . . is the person's regular practice of meeting a particular kind of situation with a specific type of conduct, such as the habit of going down a particular stairway two stairs at a time, or of giving the hand-signal for a left turn, or of alighting from railway cars while they are moving. The doing of habitual acts may become semi-automatic.

Fed.R.Evid. 406 advisory committee's note (1972) (quoting *McCormick on Evidence* § 162, at 340). The avowal testimony was insufficiently specific to constitute evidence of a habit. However, it did constitute evidence of a non-traditional character trait admissible under KRE 404(a)(1).[4] Under that rule, the accused may offer evidence of a pertinent character trait. Evidence of a character trait that would affect an individual's reaction to a triggering event is pertinent to an EED defense. In *Wellman v. Commonwealth*, Ky., 694 S.W.2d 696 (1985), we distinguished the common law "heat of passion" defense and the statutory EED defense as follows:

> It lies in the fact that the [heat of passion] requires adequate provocation in the eyes of a reasonable man under the circumstances, while the [EED] requires the jury "to place themselves in the actors' position as *he* believed it to be at the time of the act."

*Id.* at 697 (citation omitted). Thus, any character traits related to the defendant's state of mind are pertinent to the defense of EED. Further illustrating the relevance of psychological or personality-based character traits, we have stated that a defendant's mental illness is significant in deter-

---

**4.** Traditional character traits are generally regarded as character for peacefulness, honesty, violence, truthfulness, and morality. *See generally* Lawson, *supra*, § 2.15[3]. However, courts have recognized the relevance of other types of character traits and tendencies. *See, e.g., Caudill v. Commonwealth*, 120 S.W.3d at 659 (evidence that victim was cautious about whom she would let into her house relevant to prove unlawful entry by defendants but inadmissible because not within the scope of KRE 404(a)(2)). *See also United States v. Staggs*, 553 F.2d 1073, 1075 (7th Cir.1977) (tendency to direct aggression at self rather than others was character evidence), *over-* ruled on other grounds by *United States v. Ricketts*, 146 F.3d 492, 497 (7th Cir.1998); *State v. Christensen*, 129 Ariz. 32, 628 P.2d 580, 582–83 (1981) (*In Banc*) (tendency to deal poorly under stress and react in reflexive rather than reflective manner was character evidence); *State v. Williams*, 141 Ariz. 127, 685 P.2d 764, 767 (Ct.App.1984) (evidence of tendency to engage in violent acts while intoxicated is character rather than habit evidence); *Shelton v. State*, 287 Ark. 322, 699 S.W.2d 728, 735 (1985) (immaturity and lack of intelligence are character traits relevant to *mens rea*).

mining the subjective reasonableness of his/her reaction to a triggering event.

It is the presence of adequate provocation, not the absence of mental illness, which is essential to a finding of EED. Conversely, the presence of mental illness does not preclude a finding of EED. *In fact, such is entirely relevant to a subjective evaluation of the reasonableness of the defendant's response to the provocation.*

*Fields v. Commonwealth,* Ky., 44 S.W.3d 355, 359 (2001) (emphasis added).

Because an individual's personal or psychological traits are taken into account in evaluating an EED claim, the avowal testimony was evidence of a pertinent character trait. Appellant argued that witnessing Mills and Davis kill his stepfather triggered his EED. Thus, Appellant's tendency to deal with the loss of loved ones with anger and physical aggression was relevant. *See Christensen, supra* note 4, at 582–83 (error to exclude evidence in a murder trial that defendant had "difficulty dealing with stress and in stressful situations his actions were more reflexive than reflective"); *Staggs, supra* note 4, at 1075 (error to exclude evidence that defendant had a character trait for directing his aggression at himself rather than others where defendant, tried for assaulting a police officer with a deadly weapon, wanted to use that trait to prove that he had pointed the weapon at himself rather than the officer).

Though pertinent, however, Appellant's character trait for responding to the death of a loved one with anger and aggression was not provable by evidence of specific instances of conduct. While KRE 404(a)(1) permits an accused to introduce evidence of a pertinent character trait to prove action in conformity therewith, KRE 405(a) permits proof of that trait only by evidence in the form of reputation or opin-

ion. "By providing only for the use of reputation or opinion evidence in this situation, the rule plainly implies a prohibition on evidence of particular acts of conduct." Lawson, *supra,* § 2.20[4], at 116. Appellant argues that the avowal testimony was admissible under KRE 405(c), which permits proof by specific instances of conduct where a person's character or character trait "is an essential element of a charge, claim, or defense." However, character constitutes an "essential" element only in rare circumstances. " 'In criminal cases, it is rare (almost unheard of) to find that character is an element in a charge or defense.' " Lawson, *supra,* § 2.15[6], at 108 n. 45 (quoting 1 Mueller & Kirkpatrick, *Federal Evidence* § 105 (2d ed.1994)). "KRE 404 deals with character used for the purpose of showing conduct in conformity with character and thus has no applicability to situations in which the character of a party is an element of a charge, claim, or defense." *Id.* at § 2.15[6], at 108. Thus, if character is used as "a means of proving conduct circumstantially," it is not an essential element. 21 Am.Jur. P.O.F.3d § 6 (1993); *Perrin v. Anderson,* 784 F.2d 1040, 1045 (10th Cir.1986). However, if the existence of the character trait determines the rights and liabilities of the parties, then it is an essential element and provable by specific instances of conduct. Professor Lawson cites the following as examples of the latter: (1) a civil action for defamation in which the defendant accused the plaintiff of being a "crook," with the defense being the truth of the statement, (2) a criminal action involving extortionate credit transactions, "because of the need to prove [the] victim's fear of the defendant-lender," and (3) criminal cases where the defense is entrapment, because of the need to prove the defendant's predisposition to commit

the charged offense. Lawson, *supra*, § 2.15[6], at 108–09.[5]

Appellant offered the avowal testimony of his character trait to react with anger and physical aggression to the death of a loved one as circumstantial proof that he acted in conformity therewith in response to the murder of his stepfather by Mills and Davis. Thus, the existence of that character trait could not be proved by specific instances of conduct and the avowal testimony was properly excluded.

### III. JURY INSTRUCTION ISSUES.

*A. EED as an element of first-degree manslaughter.*

■ Appellant asserts error in the trial court's failure to include the presence of EED as an element of the lesser included offense of manslaughter in the first degree. We note at the outset that the murder instructions properly included the absence of EED as an element of that offense. KRS 507.020(1)(a) provides, *inter alia*:

(1) A person is guilty of murder when:
　(a) With intent to cause the death of another person, he causes the death of such person or of a third person; *except that in any prosecution under this subsection if he acted under the influence of extreme emotional disturbance . . . .*

(Emphasis added.) Appellant premises his argument on the following language in KRS 507.030(1):

(1) A person is guilty of manslaughter in the first degree when:
　. . .
　(b) With the intent to cause the death of another person, he causes the

death of such person under circumstances which do not constitute murder *because he acted under the influence of extreme emotional disturbance, as defined in subsection (1)(a) of KRS 507.020.*

(Emphasis added.)

Appellant's reliance on *Haight v. Commonwealth*, Ky., 938 S.W.2d 243 (1996), is misplaced. *Haight* only held that giving an instruction that included the presence of EED as an element of manslaughter in the first degree was harmless at worst, because the jurors found the absence of EED beyond a reasonable doubt when they convicted the defendant of murder. *Id.* at 248. In *Baze v. Commonwealth*, Ky., 965 S.W.2d 817 (1997), we held that it was error to require the Commonwealth to prove the presence of extreme emotional disturbance as an element of the offense of manslaughter in the first degree.

The inclusion of this additional element required the Commonwealth to prove the absence of extreme emotional disturbance beyond a reasonable doubt in order to obtain a conviction of murder . . . and to prove the presence of extreme emotional disturbance beyond a reasonable doubt in order to obtain a conviction of first-degree manslaughter. *Theoretically, the jury could have found by a preponderance of evidence, but not beyond a reasonable doubt, that Baze was or was not acting under the influence of extreme emotional disturbance. If so, the jury would have been required to acquit Baze of both charges.*

*Id.* at 823 (emphasis added). Thus, the trial court's instructions on manslaughter in the first degree correctly stated the law.

---

**5.** Other instances where character has been deemed an "essential element" include: (1) determining damages for emotional distress; (2) negligence actions for allowing an unfit person to operate a motor vehicle; and (3) parental fitness evaluations in child custody actions. 21 Am.Jur. P.O.F.3d § 6 (1993).

*B. Reasonable doubt pertaining to EED.*

 Appellant asserts error in the trial court's failure to include in the generic presumption of innocence/reasonable doubt instruction an admonition to the jury that if it would otherwise have found him guilty of murder, but had a reasonable doubt as to whether he was acting under EED, he could be convicted only of first-degree manslaughter. Contrary to the Commonwealth's argument, such an instruction is required if requested and if warranted by the evidence. *Commonwealth v. Hager*, Ky., 41 S.W.3d 828, 831–32 (2001); *Holbrook v. Commonwealth*, Ky., 813 S.W.2d 811, 815 (1991) (jury should be given separate instruction and definition for EED), *overruled on other grounds by Elliott v. Commonwealth*, Ky., 976 S.W.2d 416 (1998); *Edmonds v. Commonwealth*, Ky., 586 S.W.2d 24, 27 (1979), *overruled on other grounds by Wellman, supra*, at 697; 1 William S. Cooper, *Kentucky Instructions to Juries* § 2.03, cmt. (4th ed.1999) (case law requires giving the instruction upon request even though not required by RCr 9.56). However, this issue was not preserved for appeal because Appellant did not object to the instructions on these grounds, make an appropriate motion, or tender such an instruction. RCr 9.54(2). Since the murder instructions directed the jurors not to convict Appellant of murder unless they believed beyond a reasonable doubt that he was not acting under EED, the failure to include the additional admonition in the presumption of innocence/reasonable doubt instruction did not adversely affect Appellant's substantial rights. RCr 10.26.

## IV. VICTIM IMPACT STATEMENTS.

 At the final sentencing hearing, Aaron Mills's father, Richard Mills, his sister, Bridgett Kincaid, and the mother of his children, Casey West, all submitted written statements for the trial court's consideration on victim impact statement forms provided by the Commonwealth. Appellant unsuccessfully objected to the trial court's consideration of more than one statement. He argues that KRS 421.500 permits submission of only one victim impact statement. The statute reads as follows:

(1) As used in KRS 421.500 to 421.575, "victim" means an individual who suffers direct or threatened physical, financial, or emotional harm as a result of the commission of a crime classified as stalking, unlawful imprisonment, use of a minor in a sexual performance, unlawful transaction with a minor in the first degree, terroristic threatening, menacing, harassing communications, intimidating a witness, criminal homicide, robbery, rape, assault, sodomy, kidnapping, burglary, in the first or second degree, sexual abuse, wanton endangerment, criminal abuse, or incest. . . . If the victim is deceased and the relation is not the defendant, *the following relations shall be designated as "victim" for the purpose of exercising those rights contained in KRS 421.500 to 421.575:*

(a) The spouse;

(b) An adult child if paragraph (a) of this subsection does not apply;

(c) A parent if paragraphs (a) and (b) of this subsection do not apply;

(d) A sibling if paragraphs (a) through (c) of this subsection do not apply; and

(e) A grandparent if paragraphs (a) through (d) of this subsection do not apply.

(Emphasis added.)

As enacted in 1986, KRS 421.500, *et seq.*, was entitled "An Act relating to crime

victims and witnesses providing for their rights and protection." 1986 Ky. Acts, ch. 212. The purpose of this statute was to ensure that certain rights were provided for a particular class of victims, not to limit any rights or protections a trial court might choose to provide for other classes of victims. Specifically, with respect to the victim impact statement, KRS 421.520 provides:

> (1) The attorney for the Commonwealth shall notify the victim that, upon conviction of the defendant, the victim *has the right* to submit a written victim impact statement to the probation officer responsible for preparing the pre-sentence investigation report for inclusion in the report or to the court should such a report be waived by the defendant.
>
> . . .
>
> (3) The victim impact statement *shall be considered by the court* prior to any decision on the sentencing or release, including shock probation, of the defendant.

*Id.* (emphasis added). In other words, the person designated as the "victim" under KRS 421.500 has the absolute right to submit a victim impact statement and have it considered by the trial court prior to any sentencing decision. This does not remove from the trial court the discretion to consider other impact statements from other individuals affected by the crime. *See Brand v. Commonwealth,* Ky.App., 939 S.W.2d 358, 360 (1997) ("We know of nothing that suggests the trial court is without discretion to allow those injured as a result of lesser crimes from testifying as to the impact of the crimes on their lives; or for that matter from submitting impact statements. They are simply not afforded the right by statute.")

Accordingly, the judgment of convictions and the sentences imposed by the Fayette Circuit Court are affirmed.

LAMBERT, C.J.; GRAVES, JOHNSTONE, KELLER, and STUMBO, JJ., concur.

WINTERSHEIMER, J., concurs in result only without separate opinion.